STENGER, DIAMOND & GLASS, LLP
*Attorneys for M-M2 RE Holdings, 1 LLC, and M-M2 RE Holdings, 13 LLC*
1136 Route 9
Wappingers Falls, NY 12590
Tel.: (845) 298-2000, Ext. 135
Fax: (845) 298-2842
Attorney appearing: Mary K. Ephraim
(mephraim@sdglaw.com)

Hearing: May 23, 2023, at 9:00 a.m.

Objections: May 16, 2023, 5:00 p.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
In re:

BARBARA GIORDANO-LEONAGGEO,

        Debtor.

------------------------------------------------------------------ X

Chapter 12

Case No. 23-35092 (CGM)

### MOTION (I) TO DISMISS DEBTOR'S CHAPTER 12 CASE WITH PREJUDICE, OR, ALTERNATIVELY, (II) FOR RELIEF FROM THE AUTOMATIC STAY

TO THE HONORABLE CECELIA G. MORRIS,
UNITED STATES BANKRUPTCY JUDGE:

      M-M2 RE Holdings, 1 LLC ("Holdings 1"), a secured creditor holding a judgment of foreclosure granted against the property located at 150 Homan Road, Stanfordville, NY 12581 (the "Residence"), and M-M2 RE Holdings, 13 LLC ("Holdings 13" and with Holdings 1, the "Movants"), a secured creditor holding a mortgage against the property located at 151 Homan Road, Stanfordville, NY 12581 (the "Stable"), by their attorneys, Stenger, Diamond & Glass, LLP, respectfully file this Motion (i) to Dismiss the Debtor's Chapter 12 Case With Prejudice, or, alternatively, (II) for Relief From the Automatic Stay.

      In support of its Motion, the Movants respectfully state as follows:

INTRODUCTION

The Debtor's 341 meeting has shown that the Debtor, once again, has filed a bankruptcy case without meeting the Code's eligibility requirements. Her continuing abuse of the Bankruptcy Code has, once again, prejudiced the Movants. Her chapter 12 case should be dismissed.

The Debtor has exploited an exclusion for chapter 12 cases in 11 U.S.C. § 362(c) to gain the benefit of the automatic stay. She has wasted this grace on harassment of a non-creditor, M-M2 RE Holdings, 4 LLC ("Holdings 4") without meeting her obligations to make a forthright disclosure of her income, assets and liabilities. The Debtor has defaulted on two operating reports as of the date of this filing, and failed to provide pre-petition profit and loss statements required by the Trustee. Unpaid property taxes are accumulating on her properties. There is no disclosure that the properties are adequately insured.

Alternatively, the Movants seek relief from the automatic stay. The Debtor has demonstrated an insincerity toward reorganizing in good faith, including promulgating outrageous valuations of her properties that are unsupported by credible evidence. The Movants do not have equity in the properties that adequately protects them while the Debtor searches for a buyer of the Stable property at the price that she unrealistically demands.

JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York, dated as of January 31, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

The statutory bases for the relief requested herein are Bankruptcy Code sections 105(a), 109(f), 362(c)(3) and (d), and 1208(c), and Rules 2015(b) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

The Movants consent to the entry of a final order by this Court in connection with this Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection with this Motion consistent with Article III of the United States Constitution.

## THE CLAIMS OF HOLDINGS 1 AND HOLDINGS 13

Holdings 1 holds a judgment of foreclosure against the property known by the address of 150 Homan Road, Stanfordville, New York (the "Residence"). See Exhibit A. The commencement of the present case caused the postponement of the third scheduled foreclosure sale of the Residence. Pursuant to that judgment, and the loan agreement which preceded it, Holdings 1 is presently owed **$171,394.15**, as follows:

- Original Judgement as of 12/28/2020 = $84,440
- 9% Interest from 12/28/2020 – 12/19/22 = $15,003.14
- Judgment plus interest as of 12/19/22 = $99,443.14
- Additional Attorney's Fees awarded on 12/19/22 = $31,733.85
- Additional Costs awarded on 12/19/22 = $1,135.73
- Total Judgment + Attorney's Fees + Additional Costs as of 12/19/22 = $132,312.72

- 9% Interest from 12/19/22 – 2/8/23 = 51 days = $1,663.88
- Additional Attorney's Fees re: foreclosure litigation since 9/14/22 = $22,943.27
- Additional Attorney's Fees re: Debtor's chapter 13 filing = $9,060.25
- Additional Attorney's Fees re: Debtor's chapter 12 filing = $5,414.025
- Total Judgment + Interest + Attorney's Fees = **$171,394.15**

Holdings 13 commenced a foreclosure action to enforce its security against the property known by the address of 151 Homan Road, Stanfordville, New York (the "Stable"). Judgment

has not been entered in that case. The Debtor failed to appear at her deposition in that case on January 12, 2023, and discovery was stayed by the current bankruptcy filing.

Holdings 13 is owed **$87,250.80,** broken down as follows:

- Original loan amount dated 5/31/11 = $30,000
- 9% Interest from 12/6/12 – 2/8/23 = $27,466.02
- Less prior payments made by Debtor which are applied to interest: -$3,800
- Total interest due as of 2/8/23 = $23,666.02
- 5% Late Fee (applied to interest and principal) according to Note = $2,683.301
- Total Principal + Interest + Late Fee Due as of 2/8/23 = $56,349.321

- CGR Attorney's Fees re: foreclosure litigation = $6,216.21
- SDG Attorney's Fees re: foreclosure litigation = $10,211
- Attorney's Fees re: Debtor's chapter 13 filing = $9,060.25
- Attorney's Fees re: Debtor's chapter 12 filing = $5,414.025
- Total Principal + Interest + Late Fee + Attorney's Fees = **$87,250.80**

As set forth herein, the Debtor has failed to present credible evidence of the value of the Residence and the Stable. Holdings 1 and Holdings 13 reserve their rights to supplement the foregoing amounts with additional post-petition interest and attorneys fees, should the Court find that there is sufficient equity in one or both properties to support these claims under 11 U.S.C. § 506(b).

## THE DISMISSAL OF THE DEBTOR'S PREVIOUS CASE

The history of the Debtor's dispute with Holdings 1 and another entity, M-M2 RE Holdings, 4 LLC, is documented in three decisions of the New York Supreme Court. The court found that neither of these entities defrauded the Debtor, and that she was not treated unfairly or in an inequitable way. The history of the transactions is most efficiently described by the Decision of the Hon. Michael G. Hayes dated December 20, 2021 (the "Hayes Decision"), annexed as Exhibit B, submitted for the sixth time in this and the Debtor's previous bankruptcy case.

On March 3, 2022, the eve of the second scheduled foreclosure auction of the Residence, the Debtor filed for bankruptcy under chapter 13. By Order dated July 22, 2022, the Court dismissed the Debtor's previous chapter 13 case. That motion practice included numerous submissions, including copies of the Hayes Decision and other decisions by the New York State justices, an appraisal and photographs showing the derelict condition of the Residence, and an affidavit by a contractor attesting to the value of the Stable. The Debtor failed to demonstrate that she was eligible for chapter 13 relief, and never filed an operating report as she was required to do under Bankruptcy Rule 2015(c).

## THE DEBTOR'S PRESENT BANKRUPTCY CASE

On February 9, 2023, the eve of the third scheduled foreclosure auction of the Residence, the Debtor commenced the present case, electing to file under chapter 12.

**A. The Debtor has defaulted on her disclosure obligations.**

As of the date of this submission, the Debtor has failed to file the post-petition operating reports for February and March. See 11 U.S.C. § 2015(b). A third operating report, for April, will come due prior to the hearing date of this application.

At her first 341 meeting, the trustee requested the Debtor prepare profit and loss statements for the prepetition period, and share them with the Movants. See Exhibit C, p. 9, lines 11-25. The trustee correctly stated that these financial disclosures were necessary to determine the Debtor's eligibility for chapter 12. See Exhibit C, p. 9, lines 20-25. The day that these were due to be submitted, April 24, the Debtor's counsel notified the trustee that the February operating report was not ready. The Debtor's counsel did not request the consent of the undersigned to an extension. None of the financial disclosures requested by the trustee have been submitted to the undersigned.

The Debtor's willful nondisclosure of her business activities is troubling because there is a continuing mystery regarding whether the Debtor is paying her property taxes. The answer to this question should always be an unequivocal "yes." The Debtor's ambivalence on this point is unacceptable in a reorganization case.

The Debtor did not schedule monthly costs for real estate taxes or insurance on Schedule J. At her first 341 meeting, the Debtor indicated that these expenses were included on a schedule of business income and expenses—which, while required to be filed pursuant to Schedule I, Item 8a, had not been filed. See Exhibit C, p. 38, lines 8-12.

The Movants have obtained information from the public record indicating that property taxes are accumulating on the Debtor's properties. See Exhibits D (Stanford tax roll), E (online invoice). These resources indicate that county, town and school taxes are owed on the Residence and Stable in the total amount of **$7,228.10**.

This substantial debt is not disclosed as secured, priority unsecured, or nonpriority unsecured claims on Schedules D or E/F. The Debtor testified at her first 341 meeting that the property taxes had not been paid and that an amended schedule would be filed. See Exhibit C, p. 37, lines 21-25. That amendment has not been filed.

At her second 341 meeting, the Debtor testified that she had not escrowed and was not escrowing money every month to pay the taxes, leading to the inescapable conclusion that she was not earning enough money to fund this unavoidable expense.

The Debtor's failure to provide for her taxes prejudices the Movants because it appears that recourse to their security, the Residence and Stable, will be necessary. Nonpayment of taxes diminishes this security.

**B. The Debtor has subjected Holdings 1 and Holdings 13 to the automatic stay despite being ineligible for chapter 12 relief.**

Curiously, a repeat filer who elects chapter 12 is not required to show changed circumstances to support extending the stay under the plain language of 11 U.S.C. § 362(c)(3).

Therefore, the Debtor presently enjoys the benefit of the automatic stay despite (i) there being no changed circumstances since her previous case was dismissed and (ii) her meeting none of the requirements of eligibility for chapter 12.  The Debtor amply testified to this at her first 341 meeting in the present case.  She admitted that her horse breeding business was long defunct, and demonstrated a complete unawareness about the income of the business she claims to have spent her life operating:

- She has not bred a horse in three years.  Exhibit C, p. 30, lines 2-9.

- She could not remember how many inquiries she had received this year to breed her stallion for the coming season.  Exhibit C, p. 32, lines 3-9.

- She could not reasonably project how much income she would receive from breeding her stallion this year.  *Compare* Exhibit C, p. 30, lines 2-9 (testifying that she could not recall her fee from the last time she bred her stallion) *with* p. 33, line 3-8 (intending to charge $1,500 for breeding this year).

- She had no plans to harvest the cedar trees newly disclosed in this case.  *See* Exhibit C, p. 14, lines 2-23.

- She could not remember any details about her historic income from breeding her stallion, training horses, or cutting her cedar trees.  *See* Exhibit C, p. 8, line 17 – p. 9, line 5 (testifying that she did not keep a breakdown in her head for her freelance work as a horse trainer); p. 15, lines 14-24 (refusing to estimate how much she had previously made cutting trees).

- Her horse boarding operation yields negligible income.  *See* Exhibit C, p. 7, lines 9-19 (testifying that boarding two horses that month paid just $2,000).

- That her valuations of the Residence and Stable properties, at $800,000 and $400,000, respectively, were not supported by appraisals. See Exhibit C, p. 29, lines 7-20.

This testimony, in light of the Debtor's failure to disclose her business expenses on Schedule I, Item 8a, and her failure to submit profit and loss statements and operating reports, plainly demonstrates that the Debtor is not presently engaged in a "farming operation," and was not on the petition date.

Despite not being engaged in a "farming operation" under 11 U.S.C. §§ 101(21) and 109(f), Debtor has used the stay to (i) avoid her deposition in Holdings 13's foreclosure proceeding, which had not been rescheduled since she failed to appear at the deposition scheduled for January 12, 2023; and (ii) delay Holdings 1's foreclosure auction of the Residence, which had been scheduled, for the third time, for February 10, 2023.

Rather than tend to her disclosure obligations, the Debtor has spent the pendency of this case harassing Holdings 4, a non-creditor, and interfering with its taking possession of property that is not property of the estate.  These activities have included an attempt to mislead the Court by alleging a newfound interest in Holdings 4's property based upon her status as her father's heir—when in fact, the Debtor admitted at a deposition in 2020 that she knew of this interest. See ECF No. 38, p. 9, and Exhibit D thereto, p. 9, line 25, through p. 10, line 20.

<u>THE DEBTOR HAS INFLATED THE VALUE OF HER PROPERTIES</u>

The Debtor's lack of candor in the present case is demonstrated by her decision to present "comparative market analyses" to support her gross over-valuation of the Residence and the Stable—which do not provide realistic valuations based on the actual, deplorable conditions of the properties.

In her previous case, Holdings 1 and Holdings 13 presented eye-witness and photographic evidence showing the deplorable condition of the properties.  The Residence is dangerously derelict, with an inspection having revealed:

- Broken, missing and boarded-up windows throughout the entire house. See Exhibit F, p.1.

- Plaster peeling, water stains and damage on the walls and ceilings throughout the house, as there is water leaking throughout the entire structure. See Exhibit F, pp. 2-10.

- Gaping holes in the roof, requiring buckets and plastic to be put on the floor to collect the rain water coming in from the many holes. See photographs annexed as Exhibit F, p. 6, 7, 10.

- Daylight was clearly visible through the holes in the roof structure. See Exhibit F, p. 4.

- Electricity was not working in many parts of the house with open junction boxes and wet fixtures, which are a major safety hazard.

- Water lines cut/disconnected with tub and sink fixtures obviously inoperative and basins filled with debris. See Exhibit F, p. 8.

- Mold throughout many areas of the entire house. See Exhibit F, pp. 4, 5, 8, 10.

- No heat throughout the entire structure.

- One room, where there was a fire, has potential safety hazard and structural defects with charred beams.

- Collapsing ceiling/roof and side walls of "Dining area"/"sun room" ready to come down; this is a major safety hazard.

- Exposed asbestos in various areas of the house.

- Strong stench of pet urine/defecation throughout the entire house, where wooden floors have deteriorated and buckled seemingly beyond repair.

- Swimming pool which has become a garbage pit and is a safety hazard to people walking in the area.

See Exhibits F (photographs) and G (appraisal) submitted herewith. After accounting for the cost to tear down the unsafe structure, a certified appraiser determined that the value of the remaining land is just $136,000, which is unchanged at present. See Exhibit H (updated appraisal of the Residence).

At the Debtor's first 341 meeting in the present case, the undersigned alerted the Debtor's counsel to the condition of the Residence. See Exhibit C, p. 28, line 10, through p. 29, line 19 ("[Holdings 1] got an appraisal during one of the foreclosure proceedings and actually entered the property. And we believe the home is to tear down. It's probably not safe for the debtor to be living in.").

It was agreed that the Debtor would obtain an appraisal to support her valuation of the property:

> [Mr. Ealy:] But as far as the house being teared down, that's -- that's news to me.
> But I think we will have to proceed to -- to get an appraisal.
>
> Ms. Ephraim: Yeah.

Exhibit C, p. 29, lines 17-20.

The Debtor did not obtain the appraisal. In fact, since the discussion at her 341 meeting, she has *increased* her stated value of the Residence, from $800,000 as disclosed in her schedules, to $983,008. To support this valuation—which conflicts with the $500,000 valuation she assigned to it in her previous chapter 13 case—she offers only a comparative market analysis by a broker who did not inspect or even view the property instead of an appraisal by a professional who actually entered the interior of the structure and supported the valuation with photographs of the property. See Exhibit I.

This comparative market analysis has a gaping white space where the description of the Residence should be. See Exhibit I, p. 15. Nonetheless, the broker declares it comparable to modern homes with central air conditioning and chef's kitchens. *Compare* Exhibit F(photographs showing rot) *with, e.g.,* Exhibit I, p. 15 ("Envision yourself cooking in the large kitchen with vaulted ceilings, cork flooring, 9 foot island with prep sink, silestone countertops,

and walk-in pantry") and ("this 2002 built cape house set way back from the road, nicely decorated, freshly painted, and well maintained ready for you to move right in.").

As for the Stable property, which the Debtor allegedly intends to sell to fund a 100 percent plan, the comparative market analysis for this property does not indicate why, in a sales range of $165,000 to $868,000, a value of $431,381 is appropriate. See Exhibit J, pp. 7, 9, 11 (showing blanks for "Notes from Joseph Pettinella," the Realtor who presents the analysis). The document merely lists the sales prices of large land parcels. *See id.* There is nothing in the descriptions of the allegedly comparable properties that indicate that the parcels have barns on them in need of restoration or demolition and the significant financial impact on their value that would result. *See id.*

The Debtor's valuation of the Stable cannot stand in the face of the certified appraisal obtained by Holdings 13, which sets the value of the property at just $240,000, less the costs of $50,000 to repair the structure thereon, equaling a net value of just **$190,000**. See Exhibits K (affidavit of builder regarding cost to repair), L (current appraisal).

The Debtor's misleading comparative market analyses should be discarded as irrelevant hearsay. In light of the Debtor's failure to pay the property taxes on her properties, there is no question of fact regarding whether Holdings 1 and Holdings 13 are adequately protected by equity in the properties. They are not.

## THE DEBTOR IS NOT ELIGIBLE FOR CHAPTER 12 RELIEF

1. **The Court should dismiss the case because the Debtor is not eligible under 11 U.S.C. § 109(f).**

"Only a family farmer or family fisherman with regular annual income may be a debtor under chapter 12 [of the Bankruptcy Code]." 11 U.S.C. § 109(f). "The term 'family farmer with regular annual income' means family farmer whose annual income is sufficiently stable and

regular to enable such family farmer to make payments under a plan under chapter 12 of this title." 11 U.S.C. 101(21).

To qualify as a "family farmer" under 11 U.S.C. § 101(18), an individual farmer must be "engaged in a farming operation" and fulfill a "farm income" test in which at least fifty percent of the individual's gross income during the taxable year immediately preceding that in which the petition was filed must have been received from the individual's farming income. At least 50 percent of the Debtor's aggregate noncontingent, liquidated debts, excluding a debt for her principal residence, must arise out of a farming operation. *See* 11 U.S.C. § 101(18).

A "farming operation" includes "farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state." *See* § 101(21).

"There are two elements to determining if a debtor is 'engaged in a farming operation:' a temporal element (the debtor must be engaged in a farming operation on the date of filing); and a substantive element (whether the debtor's activities on that date constituted a farming operation)." *In re Comeau*, 632 B.R. 707, 712 [Bankr. D. Kan. 2021]. "Whether Debtor was 'engaged in' a farming operation on the petition date and whether a particular activity constitutes a 'farming operation' are determined on a case-by-case basis considering the totality of the circumstances." *Id.*

The Debtor has testified, in this and her previous bankruptcy case, that she boards other people's horses on a monthly basis for a flat monthly fee. See Exhibit C, p. 7, lines 7-19 ("they pay depending on what's happening that month"). This kind of sporadic and de-minimis horse boarding and training does not appear on the list of "farming operations" of § 101(21).

Courts considering similar activities have ruled that horse boarding and training do not involve the risks of farming and therefore are beyond the scope of § 101(21). *See In re Poe*, 2009 WL 2357160, at *6 (holding that horse training and boarding was not a "farming operation" because it did not involve risks of farming and "the business owner … would have profited for any investment of labor in the animal through the fees received from the horse owner up to the time in which the animal was lost."). *See also In re McKillips*, 72 B.R. 565, 568–69 (Bankr. N.D. Ill. 1987) ("Raising a colt which belongs to another is not farming if the measure of compensation is a fee rather than a share of the profits at a future sale.").

Further, the Debtor has testified that she travels to other properties to train horses off-site. See Exhibit C, p. 8, lines 17-19. This service, which does not involve any risks of farming and is not offered on the Debtor's real property, does not count as a "farming operation."

Neither does the Debtor engage in horse breeding. She has not bred her horse in three years. It was clear from the 341 meeting that she only has speculative intentions to resume horse breeding this year. Speculation cannot satisfy the eligibility requirements of § 109(e). *Cf. In re Ellis*, 478 B.R. 132, 139 (Bankr. N.D.N.Y. 2012) (ruling chapter 12 plan was not feasible, despite the fact that the debtor was straightforward, well-intentioned and hardworking; "she is one woman undertaking an entirely new venture to support payments under the proposed Plan" and had defaulted on property taxes and failed to account for hidden costs of new pumpkin farming venture).

Even if horse breeding could be considered a "farming operation," the Debtor cannot meet the "farm income" test under § 101(18) because she did not breed her horse in 2022, and her other alleged business lines, training and boarding, are not a "farming operation" under *Poe* and *McKillips*.

## 2. The Court should dismiss the case for cause.

On request of a party in interest, and after notice and a hearing, the court may dismiss a case under this chapter for cause, including—

(1) unreasonable delay, or gross mismanagement, by the debtor that is prejudicial to creditors;

... (9) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation ...

11 U.S.C. § 1208(c)(1) and (9). "A debtor's re-filing of a case may be grounds for dismissal in instances where the debtor has substantially the same assets and creditors as in the predecessor case, the debtor files in response to a foreclosure suit, or no change has occurred in the debtor's circumstances." *In re Victorious, LLC*, 545 B.R. 815, 824 [Bankr. D. Vt. 2016].

The Debtor has not filed operating reports or other financial disclosures required by the Trustee. However, she has found the time to harass a non-creditor, Holdings 4. In making her latest attack, insinuating an interest in Holdings 4's surplus money proceeding, the Debtor alleged a newly discovered interest in the property as her father's heir. This misrepresentation to the Court was debunked by the plain language of the Hayes Decision as well as her own deposition testimony. *See* Hayes Decision, p. 17, and ECF No. 38, p. 9, and Exhibit D thereto, p. 9, line 25, through p. 10, line 20.

Holdings 1 and Holdings 13 are held captive while the Debtor chases this folly in lieu of credibly pursuing reorganization. Her alleged property valuations are farcical. She has not filed any post-petition operating reports required under Bankruptcy Rule 2015(b), and she has not filed the statements for the prepetition period requested by the Trustee. She is not paying her property taxes—or even scheduled them as debts. She has not disclosed whether the parcels are adequately insured.

Continuing these proceedings is prejudicial to Holdings 1 and Holdings 13. Holdings 1 was on the brink of gaining the judicial sale provided for in its judgment of foreclosure and sale, when the Debtor disrupted it for the third time, by commencing this case under chapter 12, again on the eve of a scheduled foreclosure auction.

The Movants cannot be said to be adequately protected by equity in the properties. Even without the legal fees for work done in this and the previous bankruptcy case, Holdings 1's claim is greater than the appraised value of the Residence, which it obtained from a licensed appraisal firm, Mid Hudson Appraisal Service.

Where there is no proof that the Debtor has the requisite income to confirm a plan, and has proposed only a highly speculative asset sale, the Court should dismiss the case under Bankruptcy Code § 1208(c)(9). *See In re Victorious, LLC*, 545 B.R. 815, 826 [Bankr. D. Vt. 2016]. Here, there is no evidence that the Debtor's intention to sell the Stable is reasonably likely to result in rehabilitation. The Debtor has so muddied her disclosures regarding this asset that feasibility based upon its sale cannot be ascertained. The Debtor's outrageous listing price of $525,000 is not supported by relevant evidence, such as a credible appraisal that accounts for the condition of the barn. Neither is it consistent with her previous valuations of the property disclosed on Schedule A/B: $140,000 in her previous chapter 13 case, and $400,000 in this case.

The $400,000 valuation initially offered in this case was based upon counsel's interpretation of its assessed value plus review of some "grainy" photographs. See Exhibit C, p. 29, lines 10-15. The comparative market analysis obtained by the Debtor, unspecific as it is, suggests a value of $431,381. Upon this buffet of valuations, the Debtor's determination to list the property at nearly $100,000 more than the highest among them, is simply absurd.

Holdings 13 has obtained a credible appraisal from a local appraisal firm, setting the value of the Stable at just $240,000, less the costs of $50,000 to repair the structure thereon, equaling a net value of just **$190,000**.  See Exhibits K, L.

Holdings 1 and Holdings 13 together are owed $**255,394.94**, including interest and attorneys fees as allowed by the terms of their notes.  **$7,228.10** in undisclosed property taxes are due, presumably secured by the parcels.

Even without reaching the issue of whether the Debtor's judgment creditors shall be paid from the estate, it is unlikely that there is sufficient value in the Stable property to pay a 100 percent plan.  However, those creditors are within their rights to seek payment from the Debtor's estate.  *See* ECF No. 32, Tr. of March 28, 2023 ruling, p. 10, lines 11-16 ("Nothing in the Bankruptcy Code requires a non-debtor to satisfy the debts of a debtor using property that is not property of the estate") (*citing In Re Field*, 226 B.R. 178 [Bankr. D.S.C., 1998]); *see also U.S. Tr. Co. of New York v. Bamco 18*, 183 A.D.2d 549, 552 [1st Dept 1992] and CPLR § 5201(b).

The Debtor's judgment creditors have filed secured claims in this case of more than **$40,000**.  See Exhibit M.  Even excluding the claims of Holdings 1 and Holdings 13 for attorneys fees incurred with respect to the Debtor's bankruptcy cases, there is no evidence that there is enough value in the Stable to pay the Movants' claims, the unpaid taxes, and the claims of the judgment creditors.

   **3.  The Court should lift the stay for cause.**

On request of a party in interest and after notice and a hearing, the court shall
grant relief from the stay provided under subsection (a) of this section, such as by
terminating, annulling, modifying, or conditioning such stay—

   (1) for cause, including the lack of adequate protection of an interest in
   property of such party in interest;

   (2) with respect to a stay of an act against property under subsection (a) of this
   section, if—

      (A) the debtor does not have an equity in such property; and

      (B) such property is not necessary to an effective reorganization[.]

11 U.S.C. § 362(d).

"Although "cause" is not defined in the Bankruptcy Code, cause has been found to include non-payment of a debt or a lack of adequate protection." *In re Conrad*, 614 B.R. 20, 25 [Bankr. D. Conn. 2020]. Here, the debt owed to Holdings 1 has been in default since 2018. The debt owed to Holdings 13 has been in default at least since 2012. See affidavit of Susan Budai, annexed as Exhibit N. The Debtor, having failed to provide meaningful financial disclosures, cannot show that there is any protection available to the Movants other than their security interests in the Stable and Residence.

The argument presented in the foregoing section supports lifting the stay for each of Holdings 1 and Holdings 13, for "cause" under 11 U.S.C. § 362(d)(1).

The Court should grant Holdings 1 relief from the automatic stay so that it may proceed to foreclose on the Residence. The Debtor does not have equity in the property, and it is not necessary to an effective reorganization. The Debtor has indicated that she intends to sell the Stable to pay her plan.

Notwithstanding her attorney's valuation of the Stable at $400,000, allegedly derived from its assessed value, and the misleading comparative market analysis valuation at $431,381, the Debtor has decided to list the Stable at the staggering price of **$525,000**. See ECF No. 36-1, p. 11. There is not a shred of evidence that this is a reasonable listing price, or that hiring a broker to obtain it is a productive step toward reorganization. Pursuing a sale at that price is a fool's errand that will achieve nothing more than indefinite delay of payment to Holdings 1 and Holdings 13.

In determining whether cause exists to lift the stay, the Court may consider the debtor's bad faith in commencing the case, which in turn is demonstrated by "previous bankruptcy petitions by the debtor or a related entity, that the bankruptcy petition allows the debtor to evade pre-petition court orders, that the petition was filed on the eve of a foreclosure, that there are few debts other than those owed to moving creditor(s), and that the debtor filed the bankruptcy petition solely to create the automatic stay." *See In re Sternitzky*, 635 B.R. 353, 358 (Bankr. W.D. Wis. 2021). Each of those factors is present here.

It cannot be overlooked that the Debtor, a repeat filer, enjoys the continued benefit of the stay due to her filing the present case under chapter 12, despite being patently ineligible for relief under that chapter as set forth herein. See 11 U.S.C. § 362(c) (excluding chapter 12 cases from the 30-day limit of the stay absent a showing of changed circumstances). By electing to file under chapter 12 and thus avoiding the obligation to show changed circumstances to warrant extending the stay, the Debtor continues her troubling practice of avoiding disclosure of her financial circumstances and prospects for reorganization.

This practice is demonstrated by (i) her failure to file operating reports in this and her previous case, or the statement of business expenses required under Schedule I, Item 8a; and (ii) her decision to promote inflated and misleading asset values using empty comparative market analyses from brokers who have not inspected the properties—even after the decrepit condition of the properties was made known to her counsel and the need for a certified appraisal established.

As the Debtor has not filed operating reports, the Movants cannot undertake a meaningful discussion about adequate protection payments because the Debtor's ability to make them is unverifiable.

## **CONCLUSION**

The Debtor is not eligible for relief under chapter 12. The Court should dismiss this case as filed without meeting the standard for eligibility under 11 U.S.C. § 109(f), and for cause, in that the Debtor has failed to make required financial disclosures and pursue a meaningful plan of reorganization based on credible financial feasibility. For the same reasons, we respectively request that the Court find that there is cause to lift the stay so that Holdings 1 and Holdings 13 may pursue their state-court remedies.

WHEREFORE, it is respectfully requested that the Court enter an Order:

1. Dismissing the present case for ineligibility under 11 U.S.C. § 109(f);

2. Dismissing the present case for cause under 11 U.S.C. § 1208(c)(1) and (9);

3. Granting relief from the automatic stay to Holdings 1, so that it may proceed with enforcement of its judgment of foreclosure;

4. Granting relief from the automatic stay to Holdings 13, so that it may proceed with its foreclosure proceeding against the Debtor; and

5. Granting such other relief as the Court deems just and equitable.

Dated: April 28, 2023
Wappingers Falls, New York

Respectfully submitted,

STENGER, DIAMOND & GLASS, LLP

By: /s/ Mary K. Ephraim

1136 Route 9
Wappingers Falls, NY 12590
Tel.: (845) 298-2000, Ext. 135
Fax: (845) 298-2842
mephraim@sdglaw.com

Counsel for M-M2 RE Holdings, 1 LLC, and M-M2 RE Holdings, 13 LLC